**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES SOCCER FEDERATION FOUNDATION, INC., <br><br>         Plaintiff, <br><br> v. <br><br> UNITED STATES SOCCER FEDERATION, INC., <br><br>         Defendant. | Civil Action No. 1:18-cv-02856-TJK <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISQUALIFY**

## <u>TABLE OF CONTENTS</u>

<b>Page(s)</b>

I.     Introduction ............................................................................................................ 1

II.    Mr. Raskopf Should Be Disqualified Under Rule 1.9 ........................................... 2

    A.    U.S. Soccer Is Mr. Raskopf's Former Client ........................................... 2

        1.    *Mr. Raskopf's 1980s Representation of U.S. Soccer* ................................. 3

        2.    *Mr. Raskopf's Representation of U.S. Soccer in the 2000s* ....................... 5

    B.    Mr. Raskopf's Prior Work Was the Same or Substantially Related to this Case . 12

        1.    Same Matter, or Substantially Related Based on Same Transaction or Legal Dispute ............................................................................................ 13

        2.    *In the alternative:* Substantially Related Based on a Substantial Risk ..... 14

III.    Any Conflict Is Imputed to Quinn ...................................................................... 19

IV.    Violations of Rules 1.9 and 1.10 Alone Support Disqualification .................................. 23

V.    Mr. Raskopf Will Be A Necessary Witness At Trial ........................................... 23

VI.    Conclusion ......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*Alchemy II, Inc. v. Yes! Entm't Corp.*,
844 F. Supp. 560 (C.D. Cal. 1994) ......................................................................................11

*Allergia, Inc. v. Bouboulis*,
2015 WL 11735651 (S.D. Cal. May 5, 2015).......................................................................11

*Ambush v. Engelberg*,
282 F. Supp. 3d 58, 66 (D.D.C. 2017)................................................................................23

*Bon Vivant Catering, Inc. v. Duke Univ.*,
2016 WL 3149725 (M.D.N.C. June 3, 2016) ......................................................................18

*Caluori v. One World Techs., Inc.*,
2012 WL 2004173 (C.D. Cal. June 4, 2012) ......................................................................24

*Cardiogrip Corp. v. MD Sys., Inc.*,
2007 WL 1464249 (D. Idaho Jan. 4, 2007) ..........................................................................8

*United States v. Crowder*,
313 F. Supp. 3d 135, 143 (D.D.C. 2018) ............................................................................15

*G.D. Searle & Co. v. Nutrapharm, Inc.*
1999 WL 249725 (S.D.N.Y. Apr. 28, 1999).......................................................................14

*Graham v. TPII, LLC*,
2016 WL 10520947 (W.D. Tex. Nov. 2, 2016)...................................................................15

*Hartnett v. Disidual Clothing LLC*,
2015 TTAB LEXI 525 (Trademark Trial & App. Bd. March 28, 2015)..............................25

*\*Headfirst Baseball LLC v. Elwood*,
999 F. Supp. 2d 199 (D.D.C. 2013) ............................................................................. *passim*

*Herrera-Shorthouse v. La Cubana Bail Bonds, Inc.*,
1999 WL 33266031 (S.D. Fla. July 14, 1999).....................................................................16

*\*Home Ventilating Inst., Inc. v. Air Movement & Control Ass'n*,
2004 WL 2005809 (N.D. Ill. Aug. 30, 2004) ...............................................................12, 19

*Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP*,
482 F.3d 1 (1st Cir. 2007)....................................................................................................8

*John Crane Prod. Sols., Inc. v. R2R & D, LLC*,
2012 WL 3453696 (N.D. Tex. Aug. 14, 2012)........................................................11, 16, 17

*Koller By & Through Koller v. Richardson-Merrell Inc.*,
    737 F.2d 1038 (D.C. Cir. 1984 ........................................................................23

*Layne Christensen Co. v. Purolite Co.*,
    2011 WL 1113543 (D. Kan. Mar. 24, 2011) ....................................................11

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
    2007 WL 3203056 (N.D. Cal. Oct. 29, 2007)..................................15, 17, 18

*Marks Const. Co. v. Huntington Nat. Bank*,
    2010 WL 1404590 (N.D.W. Va. Apr. 2, 2010) ..................................................3

*Marshak v. Green*,
    505 F. Supp. 1054 (S.D.N.Y. 1981)..................................................................24

*Paul v. Judicial Watch, Inc.*,
    571 F. Supp. 2d 17 (D.D.C. 2008) ......................................................14, 15, 23

*United States v. Philip Morris Inc.*,
    312 F. Supp. 2d 27 (D.D.C. 2004) ..................................................................1, 19

*Queen v. Schultz*,
    2015 WL 13680823 (D.D.C. May 7, 2015) ......................................................24

*S. Snow Mfg. Co. v. Sno Wizard Holdings, Inc.*,
    2011 WL 6296727 (E.D. La. June 8, 2011) ......................................................17

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    2019 WL 1959493 (N.D. Cal. May 2, 2019) ....................................................22

*Sun Studs, Inc. v. Applied Theory Assocs., Inc.*,
    772 F.2d 1557 (Fed. Cir. 1985)..........................................................................16

*Sunbeam Prod., Inc. v. Hamilton Beach Brands, Inc.*,
    727 F. Supp. 2d 469 (E.D. Va. 2010) ................................................................16

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
    836 F.2d 1332 (Fed. Cir. 1988)..........................................................................11

*Teltschik v. Williams & Jensen, PLLC*,
    683 F. Supp. 2d 33 (D.D.C. 2010) ............................................................3, 5, 10

*Volkswagen Aktiengesellschaft v. Novelty, Inc.*,
    247 F. Supp. 2d 1076 (S.D. Ind. 2003) ..............................................................0

*Walker v. Sweet Cravings, Inc.*,
    1990 WL 300284 (E.D. Mich. Sept. 6, 1990)....................................................16

**State Cases**

*Derrickson v. Derrickson*,
   541 A.2d 149 (D.C. 1988) ..................................................................1, 9

*In re Sofaer*,
   728 A.2d 625 (D.C. 1999) ................................................................1, 13

**Federal Statutes**

15 U.S.C. § 1055 ....................................................................................11

15 U.S.C. § 1057(b) ..................................................................................3

15 U.S.C. § 1094 ......................................................................................3

15 U.S.C. § 1115(b) ..................................................................................6

15 U.S.C. § 1127 ....................................................................................11

**Regulations**

37 C.F.R. § 2.17(c)(2) ..............................................................................8

37 C.F.R. § 2.62(b) ..................................................................................3

37 C.F.R. § 2.167(a) ................................................................................8

37 C.F.R. § 2.193(e), ............................................................................3, 8

37 C.F.R. § 11.14 ....................................................................................3

37 C.F.R. § 11.18 ................................................................................3, 18

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ....................................................6

*D.C. Bar Ethics Opinion No. 247 ........................................................7, 11

D.C. Bar Ethics Opinion No. 312 ..............................................................5

D.C. R. Prof. Cond. Rule 1.0 ..................................................................13

*D.C. R. Prof. Cond. Rule 1.6 .............................................................5, 21

*D.C. R. Prof. Cond. Rule 1.9 ......................................................... *passim*

*D.C. R. Prof. Cond. Rule 1.10 ....................................................... *passim*

*D.C. R. Prof. Cond. Rule 3.7 ................................................................................................23, 26

Local Rule 7(m) .............................................................................................................................3

## I.     Introduction

Disqualification motions rest within the sound discretion of the district court. *Headfirst Baseball LLC v. Elwood*, 999 F. Supp. 2d 199, 204 (D.D.C. 2013). A court must scrutinize a disqualification motion; however, if the motion presents close questions, the court must resolve these questions in favor of disqualification "to avoid the appearance if not the actuality of evil." *United States v. Philip Morris Inc.*, 312 F. Supp. 2d 27, 45 (D.D.C. 2004). To that end, "[f]or purposes of disqualification, *any doubt* is to be resolved *in favor of disqualification*." *In re Sofaer*, 728 A.2d 625, 651 (D.C. 1999); *Derrickson v. Derrickson*, 541 A.2d 149, 151-52 (D.C. 1988).[1] Under this standard, disqualification of the Foundation's lead counsel, Mr. Raskopf, and his law firm, Quinn Emanuel Urquhart & Sullivan LLP ("Quinn"), is warranted here.

Met with overwhelming evidence that it is conflicted, Quinn deflects from the documents plainly establishing that it and Mr. Raskopf have switched sides on the ultimate issues at stake in this matter: the ownership and validity of certain trademarks (the "Marks at Issue"). What's more, Quinn attempts to evade the commonsense conclusion that this side-switching demands disqualification by presenting the Court with a cramped interpretation of the issues at stake, offering a myopic view of the applicable rules of conduct, and relying on inapposite case law.

In short, Quinn has no response for why its attorneys, including Mr. Raskopf, stood before the U.S. Patent & Trademark Office ("PTO") and confirmed that U.S. Soccer was the rightful owner of these "Marks at Issue" in order to secure continued protection for them (protection that, by law, benefits only U.S. Soccer); yet, now seek to invalidate these same trademarks and strip U.S. Soccer of these benefits.[2] Even if this Court concludes the questions

---

[1] Unless noted, all emphasis is added and all citations and alterations are omitted.

[2] For the Court's convenience, a chart summarizing some of Mr. Raskopf and Quinn's work for U.S. Soccer is attached as Exhibit L.

are close (and they are not), or concludes there is a risk that resolving these questions may impact the ultimate merits (they will not), the only remedy is disqualification.[3]

## II.   Mr. Raskopf Should Be Disqualified Under Rule 1.9

The parties agree that to demonstrate a conflict under Rule 1.9 U.S. Soccer must show: (1) it is Mr. Raskopf's former client, (2) Mr. Raskopf's past representation was in a matter that was the same as or substantially related to the present dispute, and (3) U.S. Soccer and the Foundation's interests are adverse. D.C. R. Prof. Cond. 1.9; Opp. at 10-11. Quinn concedes the parties' interests are adverse, Opp. at 22 n.10, and so U.S. Soccer focuses here on the first two elements. Both are readily met.

### A.   U.S. Soccer Is Mr. Raskopf's Former Client

An attorney-client relationship is formed when parties manifest an intent to create one—either explicitly or by their conduct. *Headfirst Baseball*, 999 F. Supp. 2d at 209. To determine if an attorney-client relationship existed,

> courts consider factors such as whether the client perceived that an attorney-client relationship existed, whether the client sought professional advice or assistance from the attorney, whether the attorney took action on behalf of the client, and whether the attorney represented the client in proceedings or otherwise held herself out as the client's attorney. An attorney-client relationship can exist even if the parties do not have a written agreement, the client does not pay the attorney any fees,[4] and the attorney does not give the client any legal advice.

---

[3] Quinn argues the Motion should be denied as untimely, but relies on cases so far afield from this case (where U.S. Soccer raised the issue in a letter and in person one month after the Complaint was filed, again raised it at the 26(f) conference to comply with Local Rule 7(m), and filed the Motion within *four months* of being served), that citation to them borders on spurious. *Marks Const. Co. v. Huntington Nat. Bank*, 2010 WL 1404590, at *4 (N.D.W. Va. Apr. 2, 2010) (four *year* delay in bringing motion). This case is still in its early stages and the conflict issues are important; U.S. Soccer thus requests the Court address the Motion on its merits.

[4] Quinn's emphasis on who U.S. Soccer paid is thus misguided and, alone, says nothing of whether an attorney-client relationship existed. Opp. at 19.

*Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 45 (D.D.C. 2010). As U.S. Soccer detailed in its Motion, Mr. Raskopf represented U.S. Soccer in two meaningful ways throughout his career: *first*, in the 1980s while employed at Townley & Updike where he prosecuted U.S. Soccer trademarks that are now being infringed by the Foundation's use of the Marks at Issue; and *second*, in the early 2000s while employed at White & Case and then Quinn where he prosecuted renewals for the Marks at Issue *for* U.S. Soccer.

### 1.   *Mr. Raskopf's 1980s Representation of U.S. Soccer*

To avoid the obvious conclusion that an attorney-client relationship existed between Mr. Raskopf and U.S. Soccer when he prosecuted U.S. Soccer marks implicated in this suit (such as UNITED STATES SOCCER FEDERATION), Quinn takes curious positions about the nature of attorney-client relationships. The Court should reject these outright. For example, despite his signature appearing on a response to an Office Action, Quinn deflects by noting that Mr. Raskopf's name merely appeared on correspondence to the PTO when he was a fourth-year associate and potentially inexperienced in trademark law. Opp. at 18. A response to an Office Action (where the applicant is forced to explain why an application should be accepted after the PTO initially rejects it) *can only be signed by an attorney* or the applicant. 37 C.F.R. §§ 2.62(b), 2.193(e)(2), 11.14, 11.18(a). Here, that attorney was Mr. Raskopf. That he was relatively inexperienced in no way detracts from the conclusion that he was U.S. Soccer's attorney. *Teltschik*, 683 F. Supp. 2d at 45 (attorney-client relationship exists if attorney takes action on behalf of client, attorney represents client in proceedings, or attorney holds himself out as client's attorney—all of which Mr. Raskopf did here).[5]

---

[5] Specifically, Mr. Raskopf amended U.S. Soccer's applications to seek registration on the Supplemental Register, Ervin Decl., Ex. B at 6-8, which impacted U.S. Soccer's rights in meaningful ways, *see* 15 U.S.C. §§ 1057(b), 1094 (marks on Supplemental Register not afforded (Continued...)

Quinn seems to argue that, even if Mr. Raskopf *was* conflicted under Rule 1.9, that conflict somehow disappeared once he left Townley & Updike based on Rule 1.10. Opp. at 17. This misapprehends the D.C. Rules; Rule 1.10 governs imputing one attorney's conflict *to the rest of his firm*, while Rule 1.9 governs whether Mr. Raskopf *himself* is conflicted (regardless of firm). Quinn's reliance on Comment 14 to Rule 1.10—to argue that Mr. Raskopf is not conflicted absent proof he received confidential information—does not hold water because it in no way permits a lawyer to erase *his personal* Rule 1.9 conflict merely by making a lateral move. The plain language of Comment 14 addresses only when a lawyer is conflicted based on a "particular client of *[his former] firm*" (not *his personal client*). And, logically, if Rule 1.9 does not require a client to reveal the confidences it provided to a specific attorney to prove a conflict, *see* Mot. at 19, the same reasoning applies regardless of whether that attorney moves between firms. In fact, a D.C. Ethics Opinion Quinn cites supports that Mr. Raskopf will continue to carry his *own personal* conflicts under Rule 1.9—though he may not carry his *past firm*'s conflicts to his *new firm*, nor always carry his *own personal* conflicts to his *new firm* (although, as explained below, Mr. Raskopf's personal work at Townley & Updike *does* carry over to his new firm, Quinn). D.C. Bar Ethics Opinion 312.[6] Overall, it is clear that Mr. Raskopf cannot evade his *own* conflict from Townley & Updike under Rule 1.9.

_____

same rights as those on Principal Register; supplemental registration is not prima facie evidence of the validity of the mark, ownership of the mark, or registrant's exclusive right to use mark).

[6] ("[W]hen that lawyer moves to firm B the only conflicts that the lawyer carries along from firm A are those caused by client representations in which the lawyer actually participated. *Conflicts that applied to the lawyer while in firm A only because of the imputation required by Rule 1.10(a) do not apply when the lawyer is moving to another firm.* [I]n order to trigger disqualification *of the new firm* under Rule 1.10(b), it is not sufficient for the moving lawyer simply to have participated in the representation of the client at the former firm. Rather, disqualification is appropriate only where that lawyer has 'acquired information protected by Rule 1.6 that is material to the matter.' [T]his provision 'leaves open the possibility that a (Continued...)

## 2.     *Mr. Raskopf's Representation of U.S. Soccer in the 2000s*

Mr. Raskopf also acted as U.S. Soccer's attorney in ***prosecuting the Marks at Issue***

throughout the 2000s because he "took action on behalf of [U.S. Soccer], . . . represented [U.S.

Soccer] in proceedings, [and] otherwise held [himself] out as U.S. Soccer's attorney." *Teltschik*,

683 F. Supp. 2d at 45-46; *see also* Ervin Supp. Decl., Ex. L (chart summarizing Mr. Raskopf and

Quinn's work for U.S. Soccer related to the Marks at Issue). Examining a handful (of the many)

PTO filings illustrates that U.S. Soccer has surpassed its evidentiary burden of showing an

attorney-client relationship. *Compare Teltschik*, 683 F. Supp. 2d at 45-46 (jury could conclude

that an attorney-client relationship existed where evidence of: "letters of attorney designation"

before federal agency; federal agency addressed legal correspondence intended for plaintiff to

attorney, and attorney "received, read, and responded to [the] correspondence"); *with Headfirst

Baseball*, 999 F. Supp. 2d at 209-10 (no relationship where only evidence was parties'

competing declarations).

For example, a single submission for the '950 Mark at Issue demonstrates that Mr.

Raskopf held himself out as U.S. Soccer's counsel and purported to act on U.S. Soccer's behalf.

Ervin Decl., Ex. G at 28-30. On January 10, 2006, Mr. Raskopf's then-firm (White & Case) filed

with the PTO a Combined Declaration of Use and Incontestability, listing the "**Applicant**" as

**U.S. Soccer**, attesting that the "**owner**" is using the mark in commerce, stating that the

"**Registrant**" appoints **Mr. Raskopf** as power of attorney, and featuring a "**UNITED STATES

SOCCER FEDERATION**" signature block. *Id.* at 29-30. The cover letter for this filing,

prepared by Mr. Raskopf's firm, identifies it as being submitted "***in support* of the referenced

---

lawyer, such as an associate who had only a peripheral involvement in a matter . . . would not
subject *his new firm* to disqualification under Rule 1.10(b) because that lawyer did not learn any
client confidences in the course of the representation.'").

**registration**" and lists the "**Registrant**" as "**US Soccer Federation, Inc.**" *Id.* at 28.  So, if the "**Registrant**" appointed Mr. Raskopf to act on its behalf in prosecuting the Mark at Issue, and Mr. Raskopf's firm both identified "**U.S. Soccer**" as the **"Registrant"**[7] and presented Mr. Raskopf's submission as "**in support of . . . the registration**," then U.S. Soccer necessarily appointed Mr. Raskopf to act on its behalf with regard to this registration—and both parties manifested an explicit intention to this effect. Mr. Raskopf and Quinn *now* claim he represented *only* the Foundation and U.S. Soccer failed to submit proof otherwise. But it is Quinn that has not responded to the proof in these filings that, contrary to Quinn's arguments, require no "interpretation." Opp. at 19.

Moreover, the *legal implications* of this January 2006 filing—and others like it—are further proof that Mr. Raskopf represented U.S. Soccer. As U.S. Soccer explained in its Motion, filing a statement of incontestability is explicit evidence that Mr. Raskopf was (and that U.S. Soccer would understand him to be) representing U.S. Soccer because he was seeking a benefit *only* for the registrant (*i.e.*, U.S. Soccer). *See* 15 U.S.C. § 1115(b) (for incontestable marks "the registration shall be conclusive evidence of the validity of the registered mark and of the *registration of the mark*, of the *registrant's* ownership of the mark, and of the *registrant's* exclusive right to use the registered mark"). Quinn is silent on this issue. Instead, Quinn argues Mr. Raskopf was acting only for the Foundation, which had "its own interest in maintaining the registrations." Opp. at 21. Put simply: that is not how trademark rights work. If—as the Foundation, Quinn, and Mr. Raskopf allege here—the registrations have been invalid from the

---

[7] The "*registrant*" is "[s]omeone who registers; esp., one who registers something for the purpose of securing a right or privilege granted by law upon official registration." Black's Law Dictionary (10th ed. 2014). Right or wrong, all parties agree that was and is *U.S. Soccer* here. Ervin Decl., Ex. G at 28-30; Dkt. 1 at ¶¶ 52-55 (seeking to change who is listed as registrant).

start, Opp. at 13 & n.4, then continuing to prosecute them for the *listed registrant* does not maintain (or protect) them.

Further, Quinn's arguments demonstrate precisely why the ethics opinion U.S. Soccer cited in its Motion is applicable here: "[T]he lack of notice clarifying the lawyer's role with respect to [one party] allowed a sufficient ambiguity that [the attorney] should not later take on an adverse representation in a substantially related matter over [that party's] objection." Ervin Decl., Ex. I (D.C. Bar Ethics Opinion No. 247). There, an attorney was disqualified because he worked on both sides of a transaction and, when doing so, did not make clear he was actually only working for the purchaser. So too here, where Mr. Raskopf should be disqualified because he failed to make clear *at the time of these filings* that, although he seemed to advance U.S. Soccer's interests and work on its behalf, he was actually only working for the Foundation. *Id.* If Mr. Raskopf and Quinn were *only* acting in the Foundation's interests, their prior failure to obtain a conflict waiver from U.S. Soccer and set forth the terms of their engagement demonstrate the need to bar them from now opposing U.S. Soccer in this case. *Id.*[8]

Quinn attempts to deflect from the facts here establishing that the Foundation was U.S. Soccer's agent or counsel, with Mr. Raskopf acting as a subagent, describing this as "tortured logic." Mot. at 15-18; Opp. at 22. But another submission for the '950 Mark at Issue proves that the Foundation (specifically its Chief Operating Officer and General Counsel, Mr. Kaler) *was* acting on behalf of and under the supervision of U.S. Soccer and that, in turn, so too was Mr. Raskopf. On March 7, 2006, Mr. Raskopf's firm (now Quinn) submitted a letter to the PTO

---

[8] Quinn makes little effort to distinguish this Opinion, arguing it is inapplicable because Mr. Raskopf was not involved with the *initial* applications for registration. Opp. at 13 n.4.  As U.S. Soccer explains below, this is a cramped interpretation of the issues actually before this Court—and Quinn has therefore failed to offer any reason *not* to follow Opinion No. 247.

stating that Mr. Kaler's title was "incorrectly stated" on the January 10, 2006 submission

discussed above, but confirming that Mr. Kaler "has always had the requisite authority to sign *on*

*behalf of the Registrant*." Ervin Decl., Ex. G at 19-23. The letter also states that the Mark at

Issue is "in the name of **United States Soccer Federation, Inc.**" *Id.* Quinn attached a corrected

Combined Declaration of Use and Incontestability—again listing the "**Applicant**" as **U.S.**

**Soccer**, attesting that the "**owner**" is using the mark in commerce, stating that the "**Registrant**"

appoints Mr. Raskopf (now of Quinn) as power of attorney,[9] and featuring a "**UNITED**

**STATES SOCCER FEDERATION, INC.**" signature block followed by the signature of Rob

Kaler, whose title was now "**Counsel for *Registrant***." *Id.* The declaration states that Mr. Kaler

"is properly authorized to execute this document on behalf of the Owner." *Id.*; *see* 37 C.F.R. §§

2.167(a), 2.193(e), 2.17(c)(2) (declaration and power of attorney must be signed by person with

authority to bind owner or someone with actual or implied authority to act on behalf of owner).[10]

    Despite this, Quinn claims U.S. Soccer has not submitted any evidence to demonstrate

Mr. Kaler's agency. Opp. at 19-20. But aside from that declaration, U.S. Soccer also provided

email communications between U.S. Soccer and Mr. Kaler ensuring he was timely submitting

filings with confirmations from Mr. Kaler that he was, email communications between Mr. Kaler

and U.S. Soccer reiterating why U.S. Soccer wanted to maintain ownership of the Marks at Issue,

and other instances where U.S. Soccer communicated its intent *not* to assign ownership to the

---

[9] Cases cited by Quinn support that a power of attorney *alone* creates obligations under principles of agency. *Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1, 8 (1st Cir. 2007). That U.S. Soccer gave Mr. Raskopf the power of attorney distinguishes this case from other cases Quinn cites. *See Cardiogrip Corp. v. MD Sys., Inc.*, 2007 WL 1464249, at *2-3 (D. Idaho Jan. 4, 2007).

[10] Other filings appointing Mr. Raskopf with power of attorney to prosecute the Marks at Issue and signed by Mr. Kaler explicitly identify the "**owner**" as "**United States Soccer Federation, Inc.**" Ervin Decl., Ex. D at 16, Ex. E at 15.

Foundation. Fike Decl., Exs. A-C. And, as U.S. Soccer explained in its Motion, U.S. Soccer

deputized Mr. Kaler with the understanding he would hire sub-agents (*i.e.*, experienced

trademark counsel like Mr. Raskopf) to prosecute the Marks at Issue for U.S. Soccer, the

ultimate principal. Mot. at 16-18 (citing evidence U.S. Soccer was aware Mr. Kaler retained

outside counsel in this capacity and intended for him to do so, and that PTO filings indicate

Kaler and Raskopf knew the ultimate principal was U.S. Soccer); *see also* Fike Decl., Ex. A at 8-

9 (Mr. Kaler alerting U.S. Soccer in 2005 that he had an "upcoming meeting with our IP

counsel"—which appears to be Mr. Blum & Mr. Raskopf, *see* Raskopf Decl., ¶ 8).

But again, most clearly: Mr. Kaler *himself* told the PTO he was U.S. Soccer's agent by

identifying himself as Counsel for the Registrant (U.S. Soccer) who has always been authorized

to sign on its behalf. And again: Quinn ignores these facts in its Opposition—also failing to offer

any evidence to rebut them. While Quinn *argues* that "Mr. Kaler never agreed to act on behalf of

[U.S. Soccer]," it cites no *evidence* to support that claim or place U.S. Soccer's evidence in

dispute. Opp. at 20.[11] This submission can hardly be seen as an agency relationship created "by

accident" (as Quinn argues). *Id.* Nor does Quinn explain why, for example, Mr. Kaler again

signed a declaration of use in 2010 attesting he was "authorized to execute [the] document on

behalf of the **Owner**," where the declaration plainly identifies the "***owner*** [and, by implication,

his principal, as] **United States Soccer Federation, Inc.**" Ervin Decl., Ex. G at 7-8.[12]

---

[11] Quinn's emphasis on disputed facts (Opp. at 19) also misses the mark because this Court can resolve such disputes if necessary to resolve the disqualification issue. *See Derrickson*, 541 A.2d at 151, 153.

[12] Instead, Quinn emphasizes a form agreement U.S. Soccer signed as a grantee (in 2003), indicating that grantees had no rights in, and could make only limited use of, some undefined "Foundation logo." Lerner Decl., Ex. B, ¶ 11. But what matters for *this* Motion is Mr. Raskopf and Kaler's conduct and representations to the PTO and, by implication, to U.S. Soccer. Even assuming this form language refers to the Marks at Issue, it is undisputed that *after 2003* Mr. (Continued...)

Finally, Quinn incorrectly claims that, no matter how the relevant disputed issues are resolved (and, as framed by Quinn, there are two outcomes), disqualification is not warranted. Quinn argues that, *under the first outcome,* the Foundation is the rightful owner and so Mr. Raskopf could not possibly have represented U.S. Soccer. Opp. at 21-22. But that is not the standard. The standard is whether the parties *manifest an intention* to create an attorney-client relationship, including by engaging in conduct such that the lawyer knows or *reasonably should know* the client is relying on that lawyer to provide certain services. *See Teltschik*, 683 F. Supp. 2d at 45. Thus, regardless of the factfinder's ultimate conclusion on ownership, Mr. Raskopf's conduct before the PTO can still be interpreted as him manifesting an intent to take action on behalf of U.S. Soccer and hold himself out as U.S. Soccer's attorney—particularly given how U.S. Soccer is identified in those filings and their implication under trademark law. *See Volkswagen Aktiengesellschaft v. Novelty, Inc.*, 247 F. Supp. 2d 1076, 1080–81 (S.D. Ind. 2003) (finding attorney-client relationship where evidence "show[ed] that [counsel] knew or should have known that VW was one of its clients; or, *which amounts to the same thing*, that VW *believed* it had a client-attorney relationship with [counsel], a belief that [counsel] *endorsed by its conduct*."); Ervin Decl., Ex. I (D.C. Ethics Op. No. 247).

Quinn next claims the *only other outcome* is that the Foundation is a "purported licensee or potential assignee," but in such event Mr. Raskopf's conduct did not create an attorney-client relationship. Opp. at 22. However, the cases it relies on are inapposite—and this argument again misses the point that it is the nature and legal significance of Mr. Raskopf's conduct that

---

Raskopf continued to seek protection for, and was given power of attorney by, U.S. Soccer *and* Mr. Kaler continued to acknowledge U.S. Soccer as the owner. Fike Decl., Ex. B (Foundation employees acknowledging U.S. Soccer as "owner" of the Marks at Issue that were "controlled" by U.S. Soccer in 2004); Ervin Decl., Ex. G at 14-17 (Quinn filings in 2006).

controls. *See Alchemy II, Inc. v. Yes! Entm't Corp.*, 844 F. Supp. 560, 564-65 & n.3 (C.D. Cal. 1994) (parties' rights and relationship were spelled out in a contract making clear licensee was the *only* client). Quinn also cites cases from the patent context; however, these do not aid the Court here because they involve different actors and arrangements, generally: (1) a company that hires counsel to prosecute a patent for its benefit; and (2) an individual inventor (often associated with that company) who must cooperate with counsel on technical issues and execute a power of attorney in favor of that counsel—but who is not herself a client of that counsel.[13] If anything, these cases support that the powers of attorney here—with other evidence—demonstrate an attorney-client relationship. Mr. Raskopf may have worked directly with the Foundation to submit specimens of use (like those inventors), but U.S. Soccer (like those corporate entities) was plainly the beneficiary of Mr. Raskopf's work.

More fundamentally, though, Quinn's range of two potential outcomes is impermissibly narrow. *See John Crane Prod. Sols., Inc. v. R2R & D, LLC*, 2012 WL 3453696, at *7 (N.D. Tex. Aug. 14, 2012) (court need not accept party's attempt to frame merits too narrowly at disqualification stage). U.S. Soccer could, for example, prove that the Foundation was using the mark as a "related company" under the Lanham Act.  *See* 15 U.S.C. §§ 1127, 1055 (first and later use of mark by a "related company" inures to the benefit of the registrant). Under this outcome, the original applications were accurate, U.S. Soccer is the rightful owner, and there was an attorney-client relationship between Mr. Raskopf and U.S. Soccer—as all use by a related company inures to the benefit of the registrant.

---

[13] *See Allergia, Inc. v. Bouboulis*, 2015 WL 11735651, at *6 (S.D. Cal. May 5, 2015); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1336-37 (Fed. Cir. 1988); *Layne Christensen Co. v. Purolite Co.*, 2011 WL 1113543, at *7-13 (D. Kan. Mar. 24, 2011). To the extent these cases (*e.g.*, *Telectronics*) hold that an assignment of a patent does *not* bring with it the lawyer who prosecuted it, they are irrelevant here where there has been no assignment.

Even if this Court has concerns that it must resolve disputed facts that would, in turn, impact the ultimate merits (as Quinn argues, Opp. at 19), that concern itself demands disqualification. In a case where the court concluded disqualification was intertwined with the merits, it also concluded the only path forward was disqualification:

> After reviewing the above evidence, the court finds it unclear how the disqualification issue can be decided without addressing the underlying merits of the parties' dispute. For example, if the court were to say that there was sufficient evidence presented establishing that [counsel] was representing [plaintiff] alone during this time, it would, necessarily, be opining on the merits of the underlying suit and be stating that [plaintiff] is a separate and distinct entity. The same is true if the court were to say that [counsel's] representation was for [defendant]. In so concluding the court would be deciding at least in part that [plaintiff] is not a separate entity from [defendant], an issue which is at the center of the parties' dispute. In each instance, making such a conclusion at this stage of this case, without the benefit of briefing, is entirely problematic.
>
> [To] address how a disqualification issue should be decided when its resolution is intertwined with the underlying merits of the case, [t]he only method this court can conceive of is to rule in favor of disqualification. The court acknowledges that disqualification is a drastic measure that courts should impose only when absolutely necessary, but at the same time any doubts as to the existence of a conflict must be resolved in favor of disqualification. Since the issue of whether a conflict exists depends in part on the underlying merits of the case, the only way this court can insure that conflict free counsel are involved in this case is to err on the side of disqualification.

*Home Ventilating Inst., Inc. v. Air Movement & Control Ass'n*, 2004 WL 2005809, at *7-8 (N.D. Ill. Aug. 30, 2004). Should this Court have similar doubts, *Home Ventilating* provides persuasive authority that the only fair outcome is to resolve them in favor of finding an attorney-client relationship did exist, and ordering disqualification.

### B. Mr. Raskopf's Prior Work Was the Same or Substantially Related to this Case

Rule 1.9 prohibits an attorney from switching sides on (1) the same matter or (2) substantially related matters. In turn, Rule 1.9 provides two avenues to demonstrate that matters are substantially related: (a) they involve the same transaction or legal dispute; or (b) there is a

substantial risk that confidential information that normally would have been obtained in the prior representation would materially advance the client's position in a subsequent matter. D.C. R. Prof. Cond. 1.9 & cmt. 3.

### 1. Same Matter, or Substantially Related Based on Same Transaction or Legal Dispute

This element under Rule 1.9 is readily met here. Mr. Raskopf and Quinn went before the PTO, purporting to act on behalf of U.S. Soccer, submitting declarations that confirmed the Marks at Issue were in use, and requesting that the Marks at Issue be deemed valid, subsisting, and incontestable. Ervin Decl., Ex. D at 16-17, Ex. E at 15-16, Ex. F at 11-12, Ex. G at 12-13, 16-17, 22-23, 29-30; Mot. at 7-10. Now, Mr. Raskopf and Quinn are suing the mark owner claiming it is not the rightful owner, not a proper registrant, and not entitled to any protection. This is a clear example of switching sides. *See* D.C. R. Prof. Cond. 1.9, cmt. 2 (underlying question is whether "subsequent representation can be justly regarded as a *changing of sides in the matter in question*"); D.C. R. Prof. Cond. 1.0 ("Matter means any litigation, administrative proceeding . . . , application, claim, . . . or any other representation").

In other contexts outside Rule 1.9, adjudicators have addressed when two "matters" are the "same," offering support that Mr. Raskopf switched sides on the *same matter*:

> The same lawsuit or litigation is the same matter. ***The same issue of fact involving the same parties and the same situation or conduct is the same matter***. By contrast, work as a government employee in drafting, enforcing or interpreting government or agency procedures, regulations, or laws, or in briefing abstract principles of law, does not disqualify the lawyer . . . from subsequent private employment involving the same regulations, procedures, or points of law; the same "matter" is not involved because there ***is lacking the discrete, identifiable transactions or conduct involving a particular situation and specific parties***.

*In re Sofaer*, 728 A.2d 625, 642–43 (D.C. 1999) (Board disciplinary order; citing cases).

There can be no doubt here that the same basic facts (ownership and use of the Marks at Issue), involving the same interested parties (U.S. Soccer and the Foundation—previously

working together, but now opposed), and the same situation or conduct (how the conduct of U.S. Soccer and the Foundation at the PTO, and with regard to use of the Marks at Issue, affect these issues) are involved. U.S. Soccer has therefore shown that the second element is met because the same matter, transaction, or dispute is involved. This, in turn, raises an *irrebutable presumption* that Mr. Raskopf received information during the first representation relevant to this matter. *Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17, 25 (D.D.C. 2008) (lawyer switching sides in same transaction [*e.g.*, acquiring or losing rights from PTO] is clear violation and court need not proceed to substantial risk test).

### 2.   *In the alternative:* **Substantially Related Based on a Substantial Risk**

Although this Court need not reach this issue, under it the court assesses whether there is "a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Paul*, 571 F. Supp. 2d at 21. U.S. Soccer need only plead facts showing that information from the first matter *might be useful* in the second. *Headfirst Baseball*, 999 F. Supp. 2d at 210–13 (finding matters not substantially related when moving party could point only to self-serving declaration and two ambiguous emails). U.S. Soccer is not required to reveal confidential information learned by Mr. Raskopf for Quinn. Nor may this Court "require proof that [Mr. Raskopf] actually had access to or received privileged information" in his prior representations. *Id.* at 211.[14]

---

[14] As explained below, U.S. Soccer has submitted evidence indicating Mr. Raskopf and Quinn obtained U.S. Soccer's confidential information. Still, to the extent Quinn argues U.S. Soccer *must prove* confidential information was exchanged—or even that the nature of the work "*required* the disclosure of confidential information," Opp. at 13-14—this misstates U.S. Soccer's burden under Rule 1.9. For this reason, the Foundation's reliance on *G.D. Searle & Co. v. Nutrapharm, Inc.* should be dismissed outright. 1999 WL 249725, at *3 (S.D.N.Y. Apr. 28, 1999) (requiring *proof* former firm "had access to relevant privileged information in the course of the prior representation" and finding matters not substantially related because that party "pointed to no specific information communicated to [its former firm] or materials in [its former (Continued...)

Relevant here, "[i]n the case of an organizational client . . . knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." D.C. R. Prof. Cond. 1.9, cmt. 3; *compare United States v. Crowder*, 313 F. Supp. 3d 135, 143 (D.D.C. 2018) (case Quinn cites—implicating constitutional concerns with a criminal defendant's right to choose counsel—where attorney merely made "a couple of phone calls regarding regulatory filing procedures" but "learned nothing about the companies' operations *and never filed anything on their behalf* ").

The facts discussed above—and throughout U.S. Soccer's Motion—more than demonstrate that information from Mr. Raskopf's prior work on behalf of U.S. Soccer would be beneficial to the Foundation here.[15] Indeed, courts routinely conclude that an attorney who helps secure trademark rights on behalf of a client is barred from later attacking that client's trademark rights because the representations are substantially related. *Graham v. TPII, LLC*, 2016 WL 10520947, at *5 (W.D. Tex. Nov. 2, 2016) (disqualifying counsel where it prosecuted marks for defendants that were later canceled, plaintiff registered identical marks, defendant kept using marks, and counsel now represented plaintiff in infringement suit against defendants; concluding there was "a high degree of connection" and "parity between the subject matter and issues"); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 2007 WL 3203056, at *4 (N.D. Cal. Oct. 29, 2007) (finding a substantial relationship where both representations related to the same

---

firm's] possession relating to the patent prosecutions which is relevant to the current dispute"). Moreover, in *G.D.*, the first dispute involved patents, while the second involved trademarks— and the firm's patent attorneys were screened from its trademark attorneys.  *Id.* at *2-3. Here the *same* Marks at Issue are involved and Mr. Raskopf cannot be screened from himself.

[15] The Court should therefore reject Quinn's argument that U.S. Soccer has "waived" anything. Opp. at 14. U.S. Soccer argued that a substantial relationship exists based on the same matter, transaction, or dispute—which avoids the need to reach the substantial risk test. *Paul*, 571 F. Supp. 2d at 25. Regardless, the Motion contained sufficient factual support that it would be reasonable to infer Mr. Raskopf or Quinn may have received information useful to this matter.

trademark and legal questions posed were similar to advice previously given).[16] Here, the same

Marks at Issue are involved—not distinct and unrelated ones. *Compare id.*; *with Herrera-*

*Shorthouse v. La Cubana Bail Bonds, Inc.*, 1999 WL 33266031, at *3 (S.D. Fla. July 14, 1999)

(case Quinn cited where counsel defended client in suit involving his MIAMI VICE mark and

then opposed client in suit against his LA CUBANA mark), *and Walker v. Sweet Cravings, Inc.*,

1990 WL 300284, at *3-4 (E.D. Mich. Sept. 6, 1990) (case Quinn cited where firm's past

representation of defendant involved different trademark than present lawsuit *and* defendant had

already been dismissed from lawsuit). Further, U.S. Soccer is claiming Mr. Raskopf provided

specific advice about how to maintain and protect the validity of the Marks at Issue given the

parties' relationship—not merely advice akin to "a pamphlet" on trademark law (as in *Herrera*).

*See also John Crane Prod. Sols., Inc. v. R2R & D, LLC*, 2012 WL 3453696, at *5-8 (N.D. Tex.

Aug. 14, 2012) (disqualifying defendant's counsel who switched sides in trademark dispute

involving the same mark because the specific issue of the strength of the mark appeared in both

representations).

Quinn attempts to downplay Mr. Raskopf's work by dismissing all tasks related to

trademark prosecution as "ministerial," and so not encompassing the type of services that might

involve the exchange of confidential information. Opp. at 14-15 & n.6, 25. While the forms filed

---

[16] This bar against attacking a client's rights that you helped secure at the PTO exists in patent cases, as well.  *See also Sun Studs, Inc. v. Applied Theory Assocs., Inc.*, 772 F.2d 1557, 1567 (Fed. Cir. 1985) ("[W]e do not believe any court would hold that it is within the bounds of propriety to permit a law firm to assist a client in obtaining a patent which was equitably owned by another and then to lead the attack against the patent's validity once it is transferred to its rightful owner."); *Sunbeam Prod., Inc. v. Hamilton Beach Brands, Inc.*, 727 F. Supp. 2d 469, 475 (E.D. Va. 2010) (warning that courts should not engage in "hair-splitting" when comparing matters and citing "numerous cases that have found a substantial relationship when the subject matter of patents overlapped . . . extensively [and] the lawyer's work goes directly to issues that are central to the subjects in the successive representation").

with the PTO may ultimately reflect public facts, the lead-up to determining (1) who to list as the owner or applicant; (2) the specimen to use in support of a mark; (3) which marks to continue to maintain and seek protection for; (4) the propriety of having the employee of a "related" entity sign and submit declarations of use on behalf of the listed owner and registrant; and (5) whether to list a "related company" as having used the marks (and all analysis undertaken to make these decisions) encompass the exchange of confidential information or privileged advice. *See Levi Strauss*, 2007 WL 3203056, at *4; *John Crane*, 2012 WL 3453696, at *5-9;

More specifically here, attestations about "use in commerce" and whether a mark is being used by a "related company" are ultimately questions of law that necessitate the exchange or use of privileged legal advice. *S. Snow Mfg. Co. v. Sno Wizard Holdings, Inc.*, 2011 WL 6296727, at *1 n.2 (E.D. La. June 8, 2011) ("The question of whether SnoWizard's demonstrated use of a mark constitutes use in commerce and whether The SnoWizard SnoBall Shoppe is a related entity are questions of law that the Court decides."). These same legal issues are critical to the present dispute—such that there can be no doubt that having this repository of knowledge sitting at counsel table *for the other side* far surpasses U.S. Soccer's burden of showing information that "might be useful" to the Foundation in this dispute. Quinn and Mr. Raskopf would necessarily know the weaknesses, if any, in the registrations or renewals of the Marks at Issue.

While the Foundation questions how Mr. Raskopf's work on behalf of U.S. Soccer prosecuting other marks in the 1980s bears on the substantially related analysis, Opp. at 12, U.S. Soccer already explained this connection in its Motion. Mot. at 6-7. These marks are relevant here because—while they pre-date the creation of the Foundation and the Marks at Issue—U.S. Soccer still alleges that the Foundation's use of the Marks at Issue (U.S. SOCCER FOUNDATION) will cause confusion and damage the goodwill associated with U.S. Soccer's

*other* trademarks, including those Mr. Raskopf sought to obtain and protect on U.S. Soccer's

behalf (like UNITED STATES SOCCER FEDERATION).  Mot. at 6-7; *see also Levi Strauss*,

2007 WL 3203056, at *4 (matters were substantially related even though mark in second dispute

did not exist when counsel assisted party in first dispute).

In a further attempt to obfuscate, Quinn claims that its attorneys' work prosecuting the

Marks at Issue is immaterial because none were involved when U.S. Soccer first applied for the

Marks at Issue and was first listed as the registrant and owner. This argument is flawed for

various reasons. First, neither the Foundation's claims nor U.S. Soccer's counterclaims are based

only on the initial application. The Foundation alleges it "believes that it will be damaged by the

continued registration of [the Marks at Issue]"—continuations Quinn contributed to. Dkt. 1, ¶ 54.

U.S. Soccer's claims are also based on the incontestable status of certain marks (limiting what

grounds of attack are available to challenge a registration)—and Quinn was also involved in this.

Dkt. 16, ¶¶ 39, 70. Next, Quinn opines that only the initial applications are material because once

incorrectly listed, an owner can never be corrected. Opp. at 13 & n.4.[17] Even assuming U.S.

Soccer itself never used the Marks at Issue, listing U.S. Soccer as the owner would be proper if

the Foundation is a "related company" under trademark law. *See, e.g.*, *Bon Vivant Catering, Inc.*

*v. Duke Univ.*, 2016 WL 3149725, at *8 (M.D.N.C. June 3, 2016) (entity that controls use by

related company is proper owner and, although prior regulations indicate owner should inform

PTO of this, failing to do so is not material). Quinn's excuses for why it kept filing renewals on

---

[17] As before, Quinn presumes to identify and resolve the merits of the case—which is not for it to do at this juncture. What's more, Quinn's position on this raises an additional question as to why Mr. Raskopf and Quinn continued to represent to the PTO that U.S. Soccer was the correctly listed owner, registrant, and beneficiary of the Marks at Issue if they knew the initial application was incorrect. 37 C.F.R. § 11.18 (attorney submitting or filing paper with PTO is certifying that it is true and not being submitted for improper purpose). Why rectification *now*? If only because the parties are no longer aligned, this alone is proof of a conflict.

U.S. Soccer's behalf should be recognized as what they are: failed attempts to cabin Mr. Raskopf and Quinn from what is plainly a direct involvement in a substantially related matter.

Quinn implicitly acknowledges this, indicating that resolving the disqualification issue requires resolving disputed facts that go to the heart of the Foundation's claims. Opp. at 19. But, in doing so, Quinn concedes disqualification must be the outcome here. As discussed above under the element of whether an attorney-client relationship existed, if this Court is not certain it can resolve whether Mr. Raskopf and Quinn acted on U.S. Soccer's behalf in the same or a substantially related matter without resolving disputes fundamental to the merits, then this must be resolved in favor of disqualification. *Home Ventilating*, 2004 WL 2005809, at *7-8.

Overall, the undisputed record evidence demonstrates that, regardless of the possible or eventual outcome on the merits, U.S. Soccer's former attorney Mr. Raskopf is now representing an adverse party in the same or a substantially related matter. Even if the Court believes the question is close, or concludes that it risks implicitly resolving the merits in attempting to resolve this element, any such doubts must be resolved in favor of disqualification because "where there is a close question as to whether particular confidences of the former client will be pertinent to the instant case, an attorney should be disqualified to avoid the appearance if not the actuality of evil." *Philip Morris*, 312 F. Supp. 2d at 45.

## III.   Any Conflict Is Imputed to Quinn

Because Mr. Raskopf is conflicted under Rule 1.9 based both on his work for U.S. Soccer before joining Quinn, and his work on behalf of U.S. Soccer while at Quinn, this conflict is imputed to his current firm—and Quinn must also be barred from representing the Foundation. D.C. R. Prof. Cond. 1.10; Mot. at 21.

First, Quinn fails to object (and so concedes) that if Mr. Raskopf is conflicted under Rule 1.9 based on his work *at Quinn*, then the firm must also be disqualified. Opp. at 23-24; D.C. R.

Prof. Cond. 1.10(a). Mr. Raskopf is conflicted based on his work at Quinn, meaning the whole firm is also necessarily conflicted from this case.

Next, as to Mr. Raskopf's work for U.S. Soccer *before his arrival at Quinn*, Quinn again relies on an incorrect interpretation of Rule 1.10 to argue that Mr. Raskopf's representation should not be imputed to Quinn. Opp. at 23-24. Contrary to Quinn's contentions, it is *Quinn's burden* to prove that Mr. Raskopf *did not* receive client confidences while at Townley & Updike—and thus prove that his conflict should not be imputed to Quinn. D.C. R. Prof. Cond. 1.10, cmt. 13. Mr. Raskopf attests only that "[t]o the best of [his] knowledge, [he] did not receive any [U.S. Soccer] confidential information while at Townley & Updike," and that although his name is on filings, "other firm employees generally had primary responsibility for such filings." Raskopf Decl., ¶¶ 4-5. U.S. Soccer has submitted circumstantial evidence (the significance of which is explained above) that Mr. Raskopf would have received confidential information as the *only* Townley & Updike attorney who signed responses to Office Actions (the substance of which implicated U.S. Soccer's trademark rights in meaningful ways by amending applications to the Supplemental Register). This evidence, combined with a common sense look at the work Mr. Raskopf completed, together leave little doubt that Mr. Raskopf would have received confidential information from U.S. Soccer. In light of Mr. Raskopf's equivocal statements and the other evidence in the record, U.S. Soccer submits that Quinn has not met its burden, and accordingly, Mr. Raskopf's conflict from Townley & Updike must be imputed to Quinn.

Finally, even if Mr. Raskopf is not himself conflicted under Rule 1.9, Quinn may still be conflicted based on *other attorneys' work for U.S. Soccer*. According to Quinn's arguments and Mr. Raskopf's declaration, a conflict may still be imputed to Quinn under Rule 1.10(c) based on former Quinn partner Alan Blum, who Mr. Raskopf confirms was involved in prosecuting the

Marks at Issue. Opp. at 2, 8; Raskopf Decl., ¶¶ 8, 10. D.C. Rule of Professional Conduct 1.10(c) prohibits Quinn from representing the Foundation if a *former* partner (Mr. Blum) (1) represented U.S. Soccer in the same or substantially related matter and (2) "if *any lawyer remaining in the firm* has information protected by Rule 1.6 that is material to the matter."

As to the first element, the same arguments discussed above with regard to Mr. Raskopf's work prosecuting the Marks at Issue apply to Mr. Blum (and, according to Mr. Raskopf, Decl. ¶¶ 8, 10, apply with *greater force* because Mr. Blum "handled" and "supervis[ed]" this work). Ervin Decl., Ex. D at 12-17, Ex. E at 11-16, 25, Ex. F at 1-17, Ex. G at 1-30 (Mr. Blum: given power of attorney on filings identifying owner and registrant as U.S. Soccer; receiving correspondence from PTO on these Marks; and signing documents as "Counsel for Registrant").

As to the second element, while Mr. Blum's conflict is imputed to Quinn only if another lawyer at Quinn has confidential information, Rule 1.10 makes clear that it is *Quinn's burden* to prove that *no other lawyer* has confidential information material to this matter. D.C. R. Prof. Cond. 1.10, cmts. 12-13 (question is one of access to information, which is a factual issue on which Quinn bears the burden, and "it should be inferred" that lawyers with general access to all client files are privy to *all* information about *all* the firm's clients). U.S. Soccer submitted ample evidence that Quinn attorneys would have received confidential information, particularly when considering the nature of the work they completed. In response, Mr. Raskopf attested only that while at Quinn he never "received any confidential information *from* [*U.S. Soccer*]." Raskopf, ¶¶ 12, 16. That does not mean he did not receive U.S. Soccer's confidential information *through* the Foundation pursuant to the parties' former, common-interest arrangement. *Compare id.*, ¶ 4 (indicating more clearly he does not believe he received "*any USSF* confidential information" while at Townley & Updike). In fact, U.S. Soccer submitted proof indicating Mr. Blum and Mr.

Raskopf received *from U.S. Soccer* (*through* Mr. Kaler) "all pertinent documents related to [two Marks at Issue that Mr. Blum and Mr. Raskopf prosecuted]" in 2005 when first retained. Fike Decl., Ex. A at 8-10; Raskopf Decl. ¶ 8. Moreover, Quinn has failed to demonstrate that *no one else* at Quinn received confidential information, or had access to confidential information previously received from U.S. Soccer. *Id.*, ¶¶ 12, 16 (indicating *only Mr. Raskopf's* understanding that no one at Quinn had *direct* communication with U.S. Soccer and saying nothing of attorneys' access to client files at Quinn). As U.S. Soccer explained above, questions regarding which Marks at Issue should be maintained, who should sign declarations of use, what constitutes a proper specimen to prove use, and whether to list use by a "related company" all implicate the exchange of confidential information and legal advice. And as U.S. Soccer noted in its Motion, there is evidence that this relevant information could still reside with Quinn—based on it still being listed as counsel of record for *two* of the Marks at Issue.[18]

Thus, while U.S. Soccer "has no reason to doubt the veracity of the Quinn Emanuel attorneys who have declared their lack of exposure to confidential information [directly from U.S. Soccer], allowing this case to proceed while [U.S. Soccer] is left to speculate what information its former attorneys shared with their colleagues would undermine the public trust both in the scrupulous administration of justice and in the integrity of the bar." *SC Innovations, Inc. v. Uber Techs., Inc.*, 2019 WL 1959493, at *10 (N.D. Cal. May 2, 2019). The uncertainty

---

[18] It is undisputed that Mr. Blum and Quinn are still listed as attorney of record for two Marks at Issue.  Ervin Decl., Ex. F at 1-4, Ex. G at 1-4. Quinn's argument that Arent Fox has not yet had occasion to update its status as attorney of record (Opp. at 9 n.2) ignores both that Quinn could have filed a notice of withdrawal (but it did not) and that, if anything, this suggests Arent Fox has also not yet had occasion to obtain all related client files from Quinn.

surrounding Mr. Raskopf and Mr. Blum's access to U.S. Soccer information, and what access other Quinn attorneys had, create doubts that must be resolved in favor of disqualification.

## IV.      Violations of Rules 1.9 and 1.10 Alone Support Disqualification

Assuming U.S. Soccer has demonstrated conflicts under Rules 1.9 and 1.10, Quinn next argues that this alone is insufficient to justify disqualification and that U.S. Soccer must show Quinn's involvement would also taint the proceedings. Opp. at 25 (citing *Koller*, 737 F.2d at 1056). This argument has been rejected by another court in this District that, after thoroughly analyzing the relevant Rules and cases, concluded "it is *clear* . . . that a motion to disqualify can be granted on the basis of a violation of Rule 1.9, *without any further showing*."  *Paul*, 571 F. Supp. 2d at 22-27 (indicating that any contention to the contrary by the D.C. Circuit in *Koller*, on which Quinn relies, was dicta).

This Court should follow the reasoning of *Paul* and conclude that disqualification is justified here based solely on violations of Rules 1.9 and 1.10. However, even if it does not, U.S. Soccer has shown that these proceedings *would be tainted* by the substantial unfairness of Mr. Raskopf and Quinn's involvement. The prosecution histories of the Marks at Issue will feature prominently in this case and, like the Forrest Gump of this action, Mr. Raskopf and Quinn continue to appear on material documents filed at crucial times in this dispute—which will be ripe for examination. Thus, while the Rule violations alone suffice to warrant disqualification, the facts of this case underscore that conclusion.

## V.       Mr. Raskopf Will Be A Necessary Witness At Trial

At the outset, this Court should reject Quinn's attempt to delay resolution of the necessary witness issue. While disqualification under Rule 3.7 is limited to trial, it is still ripe for determination now—particularly given there is every indication Mr. Raskopf is lead counsel. *Ambush v. Engelberg*, 282 F. Supp. 3d 58, 66 n.2 (D.D.C. 2017) (case Quinn cites where party

was not seeking to disqualify *lead* trial counsel); *Queen v. Schultz*, 2015 WL 13680823, at \*1 (D.D.C. May 7, 2015) (disqualifying counsel due to necessary witness status months after complaint was filed and years before trial).

Quinn argues that Mr. Raskopf is not a necessary witness because Mr. Kaler will be a sufficient witness on the relevant topics. Opp. at 28-29, n.13. Not so. Mr. Kaler is *not* an appropriate witness for certain issues, including those relating to inequitable conduct—which is alleged both in the Foundation's suit, and U.S. Soccer's countersuit. Opp. at 29 n.13 (attempting to distinguish case U.S. Soccer cited because it involved claims of inequitable conduct); *Caluori v. One World Techs., Inc.*, 2012 WL 2004173, at \*5 & n.5 (C.D. Cal. June 4, 2012) (rejecting argument patent inventor was sufficient witness because only patent attorney could testify to equitable issues, explain why certain things were or were not filed, and explain why he advised the inventor that certain disclosures were adequate).

Here, only Mr. Raskopf can testify why he considered adequate and sufficient the declarations of use in commerce signed by an individual not employed by the registrant. Moreover, only Mr. Raskopf can explain why, for example, his submissions to the PTO convincing it to award the Marks at Issue the utmost protection do not tend to show a state of mind sufficient to prove unclean hands or operate as an estoppel (including judicial estoppel) now that he claims he was working only on behalf of the Foundation and believed the initial applications and registrations—listing U.S. Soccer—contained irreparable mistakes. Dkt. 1 (equitable claims); Dkt. 16 (equitable defenses and counterclaims); Dkt. 20 (equitable defenses).[19] Nor should this Court accept Quinn's reliance on a TTAB decision permitting an

---

[19] *See Marshak v. Green*, 505 F. Supp. 1054, 1061 (S.D.N.Y. 1981) ("Where a party, as here, applies for the benefits of [a] registration and then receives such benefits over a period of (Continued...)

attorney to make submissions on behalf of his client before the PTO and then represent him in

TTAB proceedings against an *unrelated*, adverse party. *Hartnett v. Disidual Clothing, LLC*, 2015

TTAB LEXIS 525, *4, *11 (Trademark Trial & App. Bd. March 28, 2015). Mr. Raskopf did not

merely submit filings on behalf of one party wholly unrelated (but now adverse to) another party;

instead, his conduct, impressions, and knowledge, are mired in the complexities of the

relationship between these once-related entities that he purported to represent. Mr. Raskopf will

be a crucial witness at trial to assist with untangling the threads to arrive at the truth and

therefore should not be permitted to act as trial counsel for one of the parties in this case.

*Headfirst Baseball*, 999 F. Supp. 2d at 213-14 ("The plain language of Rule 3.7(a) suggests that

[counsel] are precluded from serving as trial counsel in this case, because the nature of their

involvement in the events preceding this litigation is in dispute.").

## VI.    Conclusion

For the reasons stated herein, and in U.S. Soccer's Motion, U.S. Soccer requests that this

Court disqualify both Mr. Raskopf and Quinn from this matter.

Dated: May 16, 2019                    Respectfully submitted,

CROWELL & MORING LLP

By: */s/ David J. Ervin*
David J. Ervin (D.C. Bar #445013)
DErvin@crowell.com
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 624-2500

---

time, he is estopped from challenging the validity of the mark under these traditional
principles."). The Foundation alleges it enforces the Marks at Issue "against third parties' uses."
Dkt. 1, ¶ 28.  If evidence reveals that the Foundation sent letters touting the Marks' status as
registered and/or incontestable, such estoppel claims become all the more forceful.

Kent B. Goss (admitted *pro hac vice*)
KGoss@crowell.com
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Tel: (213) 443-5504

*Attorneys for Defendant United States
Soccer Federation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2019, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to all counsel of record and pro se individuals with CM/ECF privileges.


*/s/ David J. Ervin*
David J. Ervin